Loring, J.,
delivered the opinion of the Court.
The petitioners are John Gould, William Patterson, James Holmes, John Eldridge, and Robert Miller, and they claim salvage compensation for saving the light-boat of the United States stationed near Shovelful, off the coast of Massachusetts.
The facts shown by the testimony are, that on the 4th of February, 1856, the light-boat was in imminent peril. The wind was blowing very heavily, and the weather was extremely cold; she was surrounded *185 Tby heavy ice, which was adrift and surging with wind and sea; it had cut through her copper and into her plank; she was leaking badly, and heavily laden with ice that had formed on her; her position was perilous, as she was anchored between two shoals, through which a strong current set with the flow and ebb of the tide, threatening to drive her aground and out to sea alternately; and her anchors and ground tackle and crew were insufficient, the last consisting of her captain and two other men. On the morning of the 4th of February she set signals of distress for assistance from the shore, but the weather prevented it from going to her; later in the day the signal of distress was taken in, and her captain and crew left her and came ashore, bringing their trunks and clothes; and they reached the shore by the people there dragging their boat through the surf. The captain of the light-boat then requested the petitioners to save the vessel and his effects on board of her. When the weather moderated the petitioners got on board the light-vessel in their own boat, making their way through the ice with difficulty, and the captain and crew accompanied them in his boat. They slipped her chains and got her under way and brought her nearer to the shore and out of the running ice. They then went ashore and got another anchor, carrying it for some distance on their shoulders; they got it off to the vessel in their own boat, and bent it and anchored her with it, and remained in the vessel all night, during which the ice moved her. The next day the wind shifted, and they made sail on her and moved her southward of the light and again anchored her. They again went ashore and got another anchor, carrying it on their shoulders as before; got it off to the vessel and bent it, and anchored her with it. They then remained in the vessel eight days, shifting her position about the light as the wind shifted. On the 14th of February the ice and ebb tide drove the vessel aground on the shoal, and the next day it carried her off again. They then for several days worked the vessel, as opportunity offered, nearer in towards Monomy harbor, till they got within a third or half ■a mile of it, and then cut a way for her through the ice. On the 17th of February it blew a heavy gale, with snow, and they got sail on the vessel and forced her through the ice into the harbor and anchored her there. The next day they carried the anchors ashore, and dug down into the sand and buried the anchors, that they might hold, and anchored her alongside the beach by the head and stern, and made her secure, and left her; and when the weather permitted, and the ice *186 ■was gone, she was towed over to Nantucket and repaired by the United States.
The petitioners’ services extended ■ through about thirteen days; they were laborious and perilous; for, besides managing the vessel'in storm and cold, they were obliged many times a day to heave up her anchors to keep them clear, and also to pump her out to keep her leak down. Then the locality was itself of dangerous navigation, as is shown by the fact that a light-boat was needed and stationed there; and the cold, ice, and wind were excessive, even for the place and season. James Gould testifies thus : “We had heavy gales of wind all around the compass — some tremendous gales with snow storms, and ice running the whole time; it was as cold again as I ever knew it before; the ice was the heaviest'!! have known for thirty years; the ice came down there twelve or fourteen feet thick.”
The details of the statement made are from the depositions of the sailors; but the perilous position of the vessel, the severity of the weather, in storms, cold, and ice, are confirmed by the testimony of disinterested and very competent witnesses — both master mariners— living at the place and witnessing the motions of the vessel and the state of the weather every day; and one of them, Mr. Harding, was the agent of the insurance companies in Boston to look after and further their interest in vessels imperilled in that dangerous locality. And if the perilous position of the vessel and the weather and sea were such as are described, the labor and peril of the petitioners was a necessary consequence, and the testimony shows that by these the vessel was saved to the United States.
We think the service rendered was a salvage service, and that the petitioners are entitled to a salvage compensation.
It is claimed by the United States that the services were rendered on a contract which bars a claim for salvage; and the evidence relied on is the statement in the petition that the captain of the light-vessel, when he came ashore, said to Mr. Gould that he “ and such other men as could go on board should be loell paid for the service, but that he had no authority to make a definite bargainand this in fact disclaims any authority to make a contract of any sort; for if he had no authority to make a definite bargain, he had no authority to contract for a quantum tneruit, for that is a definite bargain. It of itself binds the United States to nothing, and it is no evidence of an intent to bind them to anything. It is only his affirmance that the petitioners should be paid somehow, and it is as referable to salvage as anything *187 else. And to bar a claim for salvage for salvage services rendered, there must be proved a distinct agreement so explicit in terms as to satisfy the court that the salvors assented to something other than a salvage compensation, And that is not the case here.
Mr. R. H. Gillet and Mr. J. D. McPherson for the claimants.
Mr. John J. Weed, Assistant Solicitor, for the government.
It is shown by the testimony on the part of the United States that the vessel was built on contract, in 1S51, at the price of $12,000, and $195 more for additional anchors and chain. But in 1856 she was necessarily deteriorated by wear and tear in the rough service to which she belonged, and an allowance of one-third, as the difference between old and new, reduces her value to #8,130 when saved. And the court decree to the salvors a salvage compensation of #2,000, and from that to each of the salvors the sum of #400.